CAMBRELENG *et al. v.* PURTON *et al.*

*In re* LITTMAN.

(*Supreme Court, General Term, First Department.* December 29, 1890.)

PRESUMPTION OF DEATH—PARTITION.

C., an unmarried man, of intemperate habits, suffering from organic diseases incident to alcoholic indulgences disappeared from home in 1874, and was not afterwards seen or heard of, although diligent inquiries were made. He was in bad physical condition, and his physician was of opinion that he might die at any time; and that, under the most favorable circumstances, he would not live a year. He had been accustomed, on occasions of excessive drinking, to be away from home a week or longer; and on being advised by his physician that another attack would probably prove fatal, he had expressed a desire to die, stating that he could not control his habits. Letters of administration had been granted on his estate. His father died, intestate, in 1878; and in 1881 a suit for partition of the father's real estate was brought, in which C. was served by publication, and there was no appearance for him. On a motion by the purchaser at the partition sale to be relieved from his purchase, his affidavit showed diligent effort by him to ascertain whether C. was living, or the time of his death, without result. *Held* that, notwithstanding a possible doubt as to the existence of C., the title was a marketable title, and the purchaser should be required to complete the purchase. Following *Ferry* v. *Sampson*, 112 N. Y. 415, 20 N. E. Rep. 387. VAN BRUNT, P. J., dissenting.

Appeal from special term.

Action by Mary Cambreleng and another against Euphemia C. Purton and others for partition of the real estate of Alfred Colvill, deceased, intestate. Morris Littman, the purehaser at the sale in partition, moved to be relieved from his purchase, and to have the moneys paid by him on account of the purchase price and his other expenses repaid to him, which was denied. From the order denying his motion said Littman appeals.

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*Page & Taft*, for appellant. *John Vincent*, for respondents. *Kernan Bros. & Quinn*, (*William P. Quinn*, of counsel,) for Euphemia C. Purton, respondent.

BRADY, J. This is an appeal by the purchaser at a partition sale ordered in the above-entitled action, to be relieved from his purchase. It appears that Alfred Colvill died intestate, seised of the premises in question, on the 6th of December, 1878, leaving, him surviving, a widow and five children, one of whom was John Colvill. In January, 1881, an action of partition was brought by Euphemia C. Purton against Caroline W. Colvill and others for the partition of the intestate's real estate. John Colvill was not personally served, nor did he appear in the action, but the summons in reference to him was served by publication, if then living. There appeared upon this motion not only these facts, but also that from 1865 to 1870 he was a man of very intemperate habits, having spells of hard drinking, which increased in frequency

until his disappearance, in 1874, when he seems to have become a chronic drunkard. On the occasions of his excessive drinking he disappeared from home, and remained away from a week to a month. On his return he was generally prostrated, and in a very demoralized condition; indeed, an examination by his physician in 1873, upon his return after one of his debauches, disclosed the fact that he was suffering from a number of organic diseases incident to alcoholic indulgences, namely, chronic disease of the liver, congestion of the kidneys, and valvular disease of the heart. He had several severe attacks of inflammatory rheumatism, and several hemorrhages from the stomach. In 1873 he went to the Binghamton Inebriate Asylum, urged thereto by his physician and family, and remained there until the following January, when he returned to his father's house, although he had been advised by his physician to remain at the asylum for at least a year and a half, and had promised to stay there a year. After his return from the asylum he went off on a long spree of several weeks, and returned to his home in a very bad physical condition. He disappeared again in March, 1874, returning in the same condition, and had a severe illness, marked by two hemorrhages of the stomach. It was discovered that the condition of his kidneys had become decidedly worse, that his heart's action was very much disturbed, and that there was extreme congestion of the liver. He again disappeared in May, 1874, was gone a a little longer than the usual time, and returned apparently more prostrated than before. Dr. Strachan, who attended him, thought he might die at any moment, and that if he went off on another spree death would be inevitable. The doctor stated that he had never known of such severe hemorrhages of the stomach as Colvill then had, and was astonished that the man did not die from them. His legs were badly swollen, and the action of his heart was labored and intermittent, as the result of blood poisoning from the condition of his kidneys. The attending physician gave instructions that it would be unsafe for him to go out of his room, and would not allow his sister to see him, telling the family he was in a dangerous state, and that if he got away he would not come back alive, and, further, that under the most favorable circumstances he would not live a year. He had been warned by his physician that another attack would probably prove fatal, and had expressed a desire to die, stating that he could not control his unfortunate habit, and therefore had to go on the sprees in which he indulged. In June, 1874, while he was seriously ill, he was advised of the death of a lady to whom he had been attached, and it was reported engaged, and who had died during his previous spree. He was very much affected by the intelligence, and about 2 o'clock in the afternoon of that day told his brother he had some business to attend to down town, and would return in a couple of hours. His brother saw him enter a Fifth-Avenue stage. He wore one buttoned gaiter, and one shoe, and left his valise packed at his house. It was raining. His departure from his father's house, under the circumstances, subjected him to an exposure which might kill him in 24 hours, as established by the evidence of the physician and others in the case. He has never been seen or heard of since this disappearance. Diligent efforts to find him were made by his family, but without success. He was 29 years of age at the time of his final disappearance. It furthermore appears that Euphemia C. Purton, one of the defendants, was duly appointed administratrix of the personal estate of John Colvill by the surrogate of this county, who confirmed the report of the referee, Sherman W. Knevals, in the proceedings for such appointment, and who decided that John Colvill died shortly after June, 1874, the date of his last disappearance. The purchaser, in the affidavit accompanying his application to be relieved of his purchase, stated he had diligently endeavored to ascertain whether John Colvill was living at the time the action for partition was commenced, already mentioned, or at the time when the decree of sale was entered therein, or whether he had died since or was then living; but had been

unable to obtain any information whatever concerning these matters. Here then is a very important array of facts and circumstances leading to no other result than that John Colvill was dead; indeed, that his last disappearance and his death followed close upon each other, if, indeed, they were not contemporaneous; his condition then, and the exposure to which he subjected himself, resulting probably in his death within a very short time,—possibly within a few hours after he left his residence. In all probability he was found dead, and, as an unknown person, subjected to burial, without any discovery of his death by his relatives.

It is not necessary to indulge in any extended researches to ascertain what rules have governed the courts on a kindred question, particularly as in the case of *Ferry* v. *Sampson*, 112 N. Y. 415, 20 N. E. Rep. 387, the court of appeals has established a rule applicable to the facts and circumstances of this case, and calling upon this court, in the exercise of its discretion, to determine that a good and sufficient title may be given the purchaser notwithstanding a possible doubt as to the existence of John Colvill. It is there said that, although a purchaser on a judicial sale is entitled to a marketable title, that is, a title free from reasonable doubts, and the courts are not disposed to compel a purchaser to take title where a doubtful question of fact relating to an outstanding right is not concluded by the judgment under which the sale is made, nevertheless the rule is not absolute that a disputable fact not determined by the judgment is in every case a bar to the enforcement of the sale. It depends in some degree on discretion. If the existence of the alleged fact which is supposed to clog the title is a possibility merely, or the alleged outstanding right is a very improbable and remote contingency, which, according to ordinary experience, has no probable basis, the court may compel the purchaser in such a case to complete his purchase, suggesting that the discretion should be carefully and guardedly exercised, and used only where the case is free from reasonable doubt. In that case it was thought that the presumption of the death of Robert White Armstrong, an intestate, without leaving a widow or children surviving, was, upon the facts disclosed, very strong, amounting to scarcely less than certainty; and yet it was a case of his disappearance only, although he had not been out for quite a number of years, and was a man in good health. Here it appears that John Colvill was in wretched health, and who, for a series of years, had been industriously engaged in destroying it by excesses; who had declared himself to be so controlled by his habit of excessive drinking that he could not stop it; and who hoped that he would die in one of his so-called sprees. There is very little doubt that his wish in that respect was gratified, and that shortly after he was last seen he paid the penalty of his unfortunate and destructive habit. For these reasons it is thought the order appealed from was properly made, and that the purchaser should be required to complete his purchase. Ordered accordingly.

DANIELS, J., concurs.

VAN BRUNT, P. J., (*dissenting*.) I cannot concur. I do not think that a purchaser should be required to take the risk of establishing the facts upon which the decision of this motion is founded, and which depend upon the evidence of witnesses which may not always be at his command. I therefore dissent.